15-0838, people of the state of Illinois, at the lead by Gary Gnedevich v. Santos Loza, Jr. Appellant by Adam Alton. Mr. Alton. Good afternoon. May it please the court, counsel. My name is Adam Alton and I represent the appellant in this matter, Santos Loza, Jr. Your honors, we've raised two main issues that are before the court this afternoon. First, whether the trial court denied a fair trial by allowing the prosecution to publish to the jury recordings of members of the Joliet Police Department interrogating Mr. Loza. And second, whether the trial court violated Mr. Loza's confrontation rights by enjoining him from using confidential records to cross-examine one of the people's primary witnesses against him. Your honors, on the evening of October 26, 2008, Mr. Loza was at his townhome in Joliet where he was babysitting for his girlfriend's child, Kevin Bender. The child's mother, Sandra Sitko, was working at her job that evening. The record shows that the two of them, Sandra Sitko and Mr. Loza, were in close contact via text message that evening. At one point, Mr. Loza texted to Ms. Sitko that Kevin Bender, he had just given Kevin some snack food. Later in the evening, Mr. Loza reported that he and the child were watching a World Series baseball game together. Now, at roughly 11 p.m. that night, Ms. Sitko left work. She went back to the townhome and she picked up some rental videos from the townhome and she returned them to a nearby rental video store. She then returned back to the townhome roughly 10 minutes later. At some point that night, she went up to the second floor of the townhome and she stood at the threshold of the bedroom door where Kevin Bender was sleeping. Ms. Sitko testified at trial that she peered into the bedroom and that she heard Kevin Bender snoring and that she noticed nothing otherwise unusual about the child or about the bedroom, which she was able to see clearly because there was a lamp that was illuminating the bedroom that had been turned on earlier in the evening. Ms. Sitko and Mr. Loza awoke at roughly 4.30 the next morning because Mr. Loza had left work early that morning. When the two of them went into the adjoining bedroom, they found Kevin Bender like this on the bedroom floor. Now, at trial, the lead detective from the Joliet Police Department testified that from the outset, the Joliet Police Department suspected that Ms. Sitko and or Mr. Loza were responsible for causing the death of Kevin Bender. That is to say that the two of them were the primary suspects. The detectives, of course, interrogated both of them, and the prosecution at Mr. Loza's trial played the recording of his interrogation to the jury, which leads us to the first issue that's before the court. The trial court should not have allowed the prosecution to publish that recorded interrogation, and the error came to the fairness of the trial for several reasons. Now, the specific objection to playing that tape of the interrogation was what? Your Honor, we objected several times, both orally and in written motions, that the recordings were fundamentally unfair because they posed the jury to the detectives' own opinions about Mr. Loza's guilt. For example, during one point in the interrogation, one of the detectives walked into the room and proudly proclaimed that she had just satisfied her suspicion that Mr. Loza was in fact guilty of causing the death of Kevin Bender. At another point in the interrogation, the lead detective told Mr. Loza something to the effect of, I think you lost your temper, something happened, you lost your temper, you got out of your mind, you got out of control. And so the interrogation was littered with statements along those lines that were the functional equivalent of the detective getting on the witness stand and telling the jury his theory of the case and why he thought that Mr. Loza was guilty of first degree murder. What's the rule of evidence that would be applicable here? Well, the rule of evidence, we think, would be Illinois Rule of Evidence 403, that these statements were unfairly prejudicial. We think the prejudice was so great that it rises to the level of a constitutional question, a denial of Mr. Loza's fair trial right, for two different reasons. I wanted to ask you, I want to be clear on this. At trial, did the forensic pathologist that did the autopsy, did that doctor testify? That doctor did not testify, Your Honor. It's been passed away before the case went to trial. Well, another thing I noticed in the video was that at least one of the officers said, other than the doctor who did the autopsy, has said it would be impossible for the five-year-old to have inflicted these injuries on the deceased. Yes, Your Honor, and that was not really questioned as a possibility throughout the case. In addition to the problems with what the jury saw, what the jury heard from the interrogations is what they saw. At one point, for example, an evidence technician from the Joliet Police Department walked into the interrogation room and to effectuate a search warrant to take physical samples from Mr. Loza. Now, what possible probative value could be gleaned from an evidence technician walking into the room and taking bulk swabs and fingernail clippings from Mr. Loza? We argue that the only purpose of that evidence was so that the prosecution could show the jury that the Joliet Police Department thought that Mr. Loza was guilty. That kind of evidence is contrary to the current official and rises to the level of a constitutional problem. And it goes hand in hand with another reason why we think that the evidence painted the fairness of this trial, and that is that the Fifth Amendment guarantees that the defendant and only the defendant has the right to choose whether to put his character and credibility at issue before the jury. Here, the prosecution completely preempted Mr. Loza's choice on that matter. They stampeded across his constitutional right by assassinating his character and credibility through the use of the recorded interrogation. At one point, for example- There are many recorded interrogations that are presented at trials. They are, Your Honor, but there are cases where courts have decided that the recording can be so prejudicial that it paints the fairness of the trial, and that's what we're arguing here. We're not arguing for a blanket rule that all recorded interrogations should be barred. But in this case, we think that the problems were so large that this court should overturn the case because of this problem. I got the impression in your briefs you were concentrating- I mean, you suggested that it was unfair and prejudicial, but you were concentrating that it was opinion evidence that you were bothered by, that it was opinions from the police officers. Yes, Your Honor, we do think that was the fundamental problem with this evidence, is that the jury was most certainly exposed to the detective's opinions that they thought that Mr. Loza was guilty of first-degree murder. And also, as I was alluding to earlier, throughout the interrogation, they suggested that Mr. Loza was a derelict father to his own children, that he didn't care for his own recipient's children, and they repeatedly called him a liar. Now, in People v. Henderson, this court explained that it is fundamentally unfair for the prosecution to use a witness like a police officer as a human lie detector, and that's exactly what the People accomplished in this case through the use of the recorded interrogations. So, Your Honor, we think that it was fundamentally unfair in denying Mr. Loza a fair trial, that the prosecution used these recordings at trial. Now, the second issue before the court today relates to Mr. Loza's confrontation rights. The trial court prohibited Mr. Loza from using records from the Department of Children and Family Services during the cross-examination of San Francisco, and that violated Mr. Loza's rights under Article I, Section 8 of the Illinois Constitution and the Sixth Amendment to the United States Constitution. Although Section 11 of the Abuse and Neglect of Child Reporting Act generally prohibits public disclosure of DCFS records, Section 11 also empowers Illinois courts to order disclosure when the records would be helpful in resolving an issue pending before the court. And we have examples in People v. Norwood, for example. But that examination would have nothing to do with what happened in this case, would it? This was just used to potentially portray the witness as a bad person? No, Your Honor. Contrary to what the prosecution had asserted in their briefs, that was not our purpose in trying to get these records out. We were not trying to take hot shots at the witness. The purpose was to test the witness's interest, bias, and motive in testifying against Mr. Loza, and the DCFS records most certainly had something to do with this case. For example, the records showed that Ms. Sitko had recently lost custody of her children, and we thought that one of her motivations may well have been in testifying against Mr. Loza that she was trying to curry favor with the state to win back custody of her children. Of course, a much more obvious reason why she would have been motivated to testify against Mr. Loza was because she herself was the prime suspect in this case. And she testified at trial that she couldn't have even possibly had the mental capability of hurting her children, but the DCFS records plainly contradict those statements, and we should have been allowed to get those records out. As I was saying earlier, our Supreme Court has looked at this issue in People v. Norwood, and in that case the question was whether the defendant could use juvenile arrest records to cross-examine a witness. And there the court said that although Section 1-8 of the Juvenile Court Act generally prohibits public disclosure of such records, that the defendant should be allowed to use the records to test the witness's interest, bias, motive in testifying against them. This court has also considered a very similar question in People v. Davis. There the question was the defendant's use of mental health records against the witness, and there too this court came out and said, Well, the defendant's confrontation rights take precedent over the patient's psychotherapist privilege under the Mental Health Act that was at issue in that case. So we think that the case law is quite clear on this matter. Our Supreme Court has decided it in Norwood, and this court has decided it in Davis. And the Davis case rests squarely on the shoulders of Davis v. Alaska, which was a United States Supreme Court case from 1974, in which Chief Justice Berger, joined by six other members of the court, condemned not only the trial court's limitation of the defendant's right to use racial bias questions to cross-examine a witness, but the court also condemned the trial court for its elimination of the defendant's right to use confidential information to impeach the witness's credibility at trial, and that's what we're dealing with in this case. Does the DCFS report show physical abuse? Does it say why the children were removed? Your Honor, the DCFS records make some findings about Nancisco's mental state and her ability to parent. I don't think they mention anything about physical abuse. Two minutes, please. Your Honors, we think that either of these issues on their own weren't reversible in this case. The prejudicial nature of the recorded interrogations are such that Mr. Loza was denied his right to a fair trial under the Illinois Constitution and the United States Constitution, and the DCFS records also should have come out. The U.S. Supreme Court, our Supreme Court, and this Court have all favored confrontation over the preservation of confidential records, and we should have been able to get the DCFS records out to test Nancisco's people's bias and motive in testifying against Mr. Loza. If there are no other questions, we ask the Court to vacate Mr. Loza's conviction. Thank you. Thank you, counsel. Mr. Gennady. Your Honor, please report, counsel. I want to focus on Your Honor's statement with respect to the first issue. You made the comment that there are a lot of recorded interrogations, and they're admitted to trial, and counsel said that shouldn't be in this case. One thing I wrote down in my notes, and kind of my major thought here is, why not in this case? What is so special and so different about this case? Let me ask you, right along that line, what exactly in this videotape was probative of anything? I think what was probative was his responses, the nature of his responses. Did he admit anything? He never admitted anything. There's no confession, no admission. Please, no admission at all other than anything. But what is important here is you have to take and keep in mind the factual context of what went on, what happened, and the questioning. Because what we have is, we have the child being left with Mr. Loza at 4 o'clock in the afternoon when Ms. Sickle left. She did not return to the home until at least 11 to 11.30 at night. We have evidence that basically shows that the child was not hurt prior to that time. We now have the autopsy that has numerous injuries in the child, including a very severe head trauma. Now, sometime between 4 o'clock in the afternoon and 4.30 in the morning when the body was discovered, the baby was discovered, something happened to this child. And for roughly, there's about seven, seven and a half hours, the mom wasn't there. And so in asking the defendant what happened, he goes, I don't know. But didn't the autopsy also say that the death could have happened, the injury could have happened, like five hours? Four to eight hours. So, okay, we're assuming, okay, that the child was found essentially dead at 4.30. We can't time stamp exactly when death occurred. Did death occur at 4.30 or 2.30? We don't know. So how is this responsive to my question, what in the video is, what in that video would help a jury make a decision? That circumstantial evidence that he didn't know what happened and he's only with the child for almost eight hours. And the child, by the way, is in bed by the time the mom gets there. Could you put that detective on the stand and say, did you ask the defendant if he knew what happened? Yeah, I did. What did he say? He said he didn't know. This was, this is, and the record doesn't get to the prosecutor. Look, we can do this one-on-two way. We can put the tape on and let the jury see and let the jury see and let them see what the defendant, how he responded, how he reacted. Or we can call it, we can call the officer and go through the whole thing. So it's kind of like, I guess, if I, I don't really, I don't see much of a difference here. Well, the difference is, do you think the officer could get on the stand and testify that, gee, the, I talked to the forensic pathologist and he said there's no way the five-year-old could have been responsible for this. Could the officer have testified to that? The answer is no. You know that. And could the officer have got on the stand and said, I think you did it, you either did it, I think the defendant either did it or he's covering up for somebody that did. Could he testify to that? He would not be able to testify to that if he was asked that, if he or she was asked that question. But in the context of trying to take and find out what would happen and in the context of asking questions, because we all know that in any kind of interrogation, even those that never come up in this kind of context, those kinds of questions are always asked. It's not a question. It's not a question of an opinion. It's a question of trying to take and elicit a response. It's given a theory. I'm not suggesting the police did anything wrong, but that doesn't mean you can show the video of what's the difference in doing what happened here and having the state call the defendant and say, get on the stand, Mr. Defendant, and you did this, didn't you? If you didn't do it, you know who did it. And this 45 minutes of accusations by police officers, and he'd say, no, I didn't, and sit there and deny it. What is, in the real world, what is the difference between showing this videotape and letting the state call the defendant to the stand? Now, if there had been some admission or something probative in there, but I'm still kind of waiting for you to explain what in the world in that videotape, because I've watched it, is probative, it would allow a jury to determine whether this man is guilty or innocent. The, as happened in Bryant, the body language, how he responded, the lack of affect, the lack of anything, basically, you know, it allows the jury to take and see whether or not... You know, Brownington really... Go ahead. Well, so you're, in essence, you're having them testify in front of the jury. In any, in any scenario. But in virtually all those, they've got, you've got, the defendant says something that either lies about something, they say they lied about this. Not in Bryant. Not in Bryant. Bryant is exactly the same scenario that we have here. Well... And the thing is, in response to your honor, you basically say there's not much difference between showing that tape and having the state call the defendant to the stand. Well, of course, we know that can happen, but I'm cognizant of that. Basically, showing the tape is no different than calling the officer to the stand and having them testify at the same time. Well... And the officer, they wouldn't be able to take and testify as to what they perceived, how much affect was it, what it was. But what the officer, you agree, the officer could not get up there and testify and say, I think you did it. And the pathologist told me the five-year-old couldn't have done it. Impossible. That's true. The officer couldn't have testified to those things, but in essence, he did when you showed that videotape. And so you've got 40 minutes of nothing more than police accusations against this guy, who says... I don't know what happened, even though I was away with the child for almost eight hours. Well, we know it didn't happen in eight hours. The mother said she came home and she said she heard the child snoring and the child was fine. And so he wasn't the only one there. There was a five-year-old and at some point the mother. That's right. And we also have the statement that the mother didn't do it. Or the mother. Did he say the mother did it? Yes, he did, on the tape. He basically said, she didn't do anything, she didn't harm her. I didn't harm her. What happened, I don't know. Now, wait a second. If you only got two people here. There were three. There was a five-year-old there, wasn't there? There was a five-year-old there at 1130, right. And based on the nature of the injury. And I believe, if I am not mistaken, I could be wrong. I thought that even on that testimony they had another doctor testify. Because the one pathologist had passed away. I believe that that doctor also made a comment in the statement that basically a five-year-old could not have caused these injuries. So the point of the matter is, is the fact that when we have this, we have it as otherwise an inexplicable situation that happened to this eight-month-old. And we have somebody who is there for the better part of the time with the child who is basically saying, I don't know what happened. But I do know that I didn't do anything and I do know the mother did it. You had mentioned earlier that there was evidence that the child was fine before 430. Doesn't the mom, when she's questioned, doesn't she say that she, that the child could have fallen off the couch at her father's house or had fallen down the stairs? No, I remember, I don't, I read her testimony. No, when she was first questioned by the. The testimony, I don't recall ever, that ever, it doesn't even go with me. I know her testimony in trial was that the child was not hurt or injured prior to 4 o'clock. Now back to the, usually when an interrogation is admitted, as suggested by Justice Smith, that there's an admission. I mean you talk about looking at the defendant's demeanor, that's when the defendant testifies, right? That would be when. And if the defendant chooses not to testify, and in this case what happened? Chose not to testify. Okay, so they get to put him on the stand anyway? I don't think that, I understand because of the pictorial, what you're saying is you're putting him on the stand. But would it be irreversible error if the prosecutor said, okay, you have a question, what did you ask? I asked him this, and he said this. They said the same questions that they asked. I even suggested, you know, maybe you lost it, maybe you did this, and I got no response. Let's stop there. What's the relevancy of that? You know, there are certain, how does that get in? The very thing you're talking about, how does that get in? What's the relevancy of that? We have some things that the officer can testify about because it's allowed in just to show why the officer took step one, step two, and step three, right? Okay, so let's say the officer took the stand. How much, in addition to what Judge Schmidt's talking about, where you wouldn't have a lot of those statements that are in that video come in, what would be the other justification? There's been no admission, right? Correct. So can the police willy-nilly get on the stand and start testifying about all the questions they ask potential defendants, and including the defendant on trial, that you arrested the guy, yes, and you asked him pertinent questions about this case. Would that come in? How would that come in?  What rule of evidence? The evidence is the fact that the officer is able to take and testify over the course of their investigation. The officer can take and testify what they asked. They're not being asked to give an opinion about his guilt. They're being asked, why did you ask this question? What was the purpose? Well, the purpose was to take the trial. And what's the relevancy of that? Because of the fact that what you have is you have somebody who's with the child who's saying, I don't know what happened. And what you're trying to show is you're trying to take and show, if nothing else, circumstantially, exactly, the fact that what this person is saying is basically this person is not being truthful. This person is not being candid. And you're trying to take and show that basically... So you're allowing the officer to say, well, so the officer is taking the stand and saying, I asked these questions to the person, and they said they never admitted anything. But the reason, the relevancy for the question and answer from the police officer, not the tape, just calling the officer on the stand, is to show in the course of their investigation, they were testing to see if this was the one? If he was a suspect, if there was someone else, if he knew something else, if he was hiding... So that comes in trials all the time? Suspects, they... I don't think that's something that comes in all the time, but I'm sure that it has come in at times. I'm sure there have been times when what you're trying to take and do is, these officers have got to understand, at this particular point in time, these officers are trying to determine whether or not it was Mom or whether it was the defendant. And whether or not he's trying to hide something, they're trying to take and show. This is a trial. We get all that. Nobody's saying the police did anything wrong. But the question is, can you show that to the jury? And let me ask, hypothetically, let's suppose there's no videotape. Can you put the officer on the stand and say, okay, the defendant talked to you. Did you ask him whether he heard this kid? Yeah, I did. You think he was telling you the truth? No, I think he was lying. Well, and that's all over that videotape. Ah, well, okay. If that's how your honor is interpreting things, because I don't get that flavor at all. I know that there are times when they make a comment about, you can't cover up somebody's no good. All of that is doing nothing more than trying to get the individual, in fact, individual to speak who has said he's willing to speak, whose range is right. And I think an officer can take and testify to things that they did, things that they know. But to give an opinion like you just said, no doubt about it, is wrong, is error. But that's not what happened here. And so that's, I guess, where I kind of. Well, let's talk about that. You put the officer on the stand. And by the way, typically it would be a defendant. When a guy's denying everything and has never admitted anything, then the defendant is trying to put, well, the officer asked all these questions and the guy denied it all the way through. And so, and typically a motion to allow this evidence, trial court, denied. The defendant's trying to put that on because there were these denials, prior consistent statements that I'm denying, you know, that I'm denying that I did this. I'm pleading not guilty. So I have consistent, I don't want to take the stand here, but I've got consistent statements before that I denied doing this. And so how many judges allow that in? Well, the rule against prior consistent statement cuts both ways. Not only the defendant against the state, too. The state can't put on a prior consistent statement at all. That's not the point. Okay? That's not the point at all. And so the whole thing here is the fact that we have officers always testify in DUI cases. They always, what they can say is that, you know, based on these facts here, you know, the defendant was under the influence. Okay? You can draw conclusions from what you see. As long as what you see, as long as you're testifying to facts that you see, that you observe, not that you heard, right, you can testify to those and you can testify to those conclusions. So what are the facts that the officer is testifying? If the officer took the stand, not the videotape, what's the? He appeared nervous? What they asked. The questions they asked, the kind of response they got, the kind of affect that he had, the kind of lack of emotion. What's the statement about the affect? Pardon me? Where was the statement from the colleague? Oh, I'm not saying. What I'm saying is you can see that on the tape. I'm not saying that. Well, I know you can see it. I'm saying, so the officer, you said it's no different than the officer testifying on the tape. Well, there's a big difference, but let's say the officer was on the stand. What affect? He can testify. They can testify to what they saw, how the defendant understood, how the defendant was, how his responses were flat, how he basically, basically describing what is depicted on the tape. They can take and try to take and articulate that in words to the jury. They wouldn't be able to take and do that. They have that ability because it happened in front of them. They're the ones that were there. They saw it. That's what they saw. So what did they see? Lying? Cheating? They would not take and say anything I don't think will line up. We think he's cheating. We think he's lying. That would be a conclusion of opinion about an alternate issue of fact. But they can testify to all the facts that they saw that would allow the jury to make that determination. Give me an example. But put the officer on a stand. He asks this question. Try to get him this way. Well, officer, you interrogated the defendant. Yeah, I did. And what did you say to him? I said I know you either did it or you're covering up for somebody that did. Can you answer that? Can you phrase that question to the officer on a witness stand? I told, during the interrogation, I told him I know you either did it or you're covering up for someone who did. Permissible question? I think so. Because it's something that he actually said he did. If the response, he responded no. So if the officer said, hey, so he said, what else did you say? I said you're a liar, your feet stink, and you don't love Jesus. That's what I told him. And can he testify to that, that he told the defendant that? If the defendant's not testifying? I think that he would be able to take an F and say exactly what he asked the individual. Do you have a case like that? It's not only the question, but it's also the response. And the thing is, if it's a question that was asked and not an opinion, not saying I know you're guilty, I know you did this, and I know you're lying, that would be the opinion, that would be usurping the function of the jury. But basically reiterating the questions that you asked, no matter how outrageous they may sound, no matter how out there they may be, they're not an opinion, they're not a conclusion. He's not drawing conclusions. What everything shows, and I think a reasonable person looking at that will say, you see, all they're trying to do is they're not giving us their opinion. They're not trying to tell us we've got to find him guilty. What they're doing is we can see that the officer's trying to get this guy to speak, trying to get him to talk because we've got somebody that knows something who claims he doesn't know what in the world happened to this child. All the decisions we just heard about. One minute. Thank you. And that could be done, the officer interrogates the guy, you have to have 40 minutes, and during the 40 minutes, did he answer your questions? He denied injuring the child or knowing how the child got injured. You know, there's a thing called legal relevance where something to the extent it has any relevance, it can instill the prejudice, how far away it's inappropriate value. And the length of this tape of accusations from police officers seems to me to be outside, beyond the tape. Now, hold on, I can say another one. Well, if you disagree, I guess you've got a job to do. Basically, I mean, if that is your tape, then that's... The tape is what it is. The tape is what it is. As a lot of... I hear tribal attorneys always say, you know, the document speaks for itself. And so, however the court interprets that, that's how the court's going to interpret it. I just think that under this scenario, under this unique factual scenario where we have a defendant who basically says, Mom didn't do it, I didn't do it, but yet the child is still dead, and I don't know how it happened, but he's living a greater part of the time that the child's dead when this happens. And basically says, I don't know what happened. You know, it precipitates... I guess what I'm saying is, from a police investigative point of view, it's going to precipitate a lot of questions. It's going to precipitate a lot of things along this line. The question is, though, whether or not that tape should have been shown. The question is whether or not even the testimony is relevant. Nobody's criticizing the police here. But the fact of the matter is, to what is the probative value, what's the evidentiary basis that would allow a jury with confident evidence in that videotape to determine this fellow's innocence or guilt? It's nothing more than a combination of circumstantial evidence, of the facts that were presented, as well as his responses to the questions, and his lack of responsiveness to the questions. By lack of responsiveness, I guess he did respond, but the lack of being able to take the time to think when, in reality, for the most part, he was there for the longest period of time, and there's actually no indication at all of any act that monitored, that monitored even around the time. And that's a great argument to the jury in closing, but I still don't see how that's relevant to whether or not this videotape is admissible. See, I'm trying to put this into the Illinois rules. We don't have, looking at the videotape, there's no admission. There's nothing indicating, you know, in the concept of consciousness of guilt, which you allow certain things in, and one is you're accused of something and you remain mute. You know, that's been allowed in as consciousness of guilt. We don't have that in that tape, do we? I really, but I kind of just want to get in from your honor, with all due respect, there's not so much the question about, well, I guess maybe it's admissibility, but I guess it's more, you seem to be much more of a relevancy, because basically, basically under the rule, because defendant's statements come in because they're not hearsay. And so if you're looking more for a basis for relevance... The statements, they come in because they're what? They're not hearsay. The only way they're going to come in is if it's irrelevant information. You're talking about the statements are verbal acts, that's what you're saying. Right. How are these verbal acts relevant? Even though the statements are that he doesn't know anything, the fact is, that stands in stark contrast to the fact, to what the other facts that were reduced are, which is his presence with the child during the known share of the time when these injuries were... Let's keep this simple. The officer gets on the stand, and he says, what happened? And the guy says, I don't know what happened, and the evidence is that he was with the child, in the vicinity of the child during this period of time. Does that come in? The officer testifies, I asked him, what happened? He said, I don't know what happened. And so they put that in to show that this must be the guy, because he can't explain what happened. I think that that is a piece of circumstantial evidence that the jury can take into consideration. And in what rule of evidence, how does that come in? In the Illinois rules. First of all, it's the defendant's statement. So it doesn't have to be his statement against interest or any kind of admission. Defendant's statement, whatever he says, they can come in. It's not a hearsay. Basically, it's a statement by a party opponent. And he can take and come in, or that statement can come in regardless. I think it's 803, the Illinois rule. You're kind of talking more about, to me, you're coming more on relevancy. You don't seem to think that that's relevant or anything. And relevancy is somewhat entirely different than admissibility. So you're saying the 803 is what you're saying? I think that's the rule. Those are hearsay rules. Thank you. Thank you. Counsel, some rebuttal. Thank you, Your Honors. And may it please the Court once again. Your Honors, the first question that the Court put to the FLE was, what is the covenant value of the video? And I think the Court hit the nail on the head. And my brother's response was, his response, his body language. Well, his response may come in at some point, but the proper way to put in Mr. Loza's response to any questions would be to put the witness on the witness stand and put questions to the witness, in this case the detective, asking what Mr. Loza said. And we would have no objection to some of those questions coming in. But to put the video of the interrogation in, to show Mr. Loza's body language, just highlights the point that we made earlier, which is that they were trying to circumvent his Fifth Amendment rights to choose whether to put his character and credibility in evidence by putting the recordings of the interrogations in evidence and showing the jury, taking hot shots at Mr. Loza. Could there be an admission by body language? There can be, Your Honor, under the rules of evidence. I believe there can be a positive assertion with no words spoken, but I don't think within the situation in this case from the video, there was no... And why not? Because Mr. Loza's body language never convinced any statement of whether he was involved in any way in causing harm to Kevin Bender. One way or the other, and his words were sufficient, as the court noted earlier, and as my attorney said, Mr. Loza said he didn't know what happened. And another point is that the appellee mentions that Mr. Loza said that Ms. Sitko didn't do anything. Well, I don't think he ever said that plainly. He said he didn't think she would do anything. He wasn't professing his knowledge about the facts of what happened other than the fact that he didn't know what happened, and he wasn't involved in it. Now, Bryant seemed to let all this in. It did, Your Honor, and I think the big distinguishing factor between Bryant in this case is, of course, that in Bryant there was a limited instruction, and we asked strenuously for limited instruction in this case trying to convince the court that there would be no harm in issuing a limited instruction. And what was the limited instruction you wanted? Well, we modeled it after Bryant. We would have taken limited instruction verbatim from Bryant. In fact, we advocated for that at trial. And that was the one you wanted at trial? Yes, Your Honor. We think that would have been proper in this case. Of course, our primary argument was that the recording never should come in in the first place because of the relevancy concerns that this court has raised before and because of all the reasons that we stated earlier. And one of the questions that the court put to the appellee was, what is the rule of evidence that would allow this? Well, I don't think that the people had a very good answer to that, and I think the reason is that because Rule 403s would strictly prohibit this kind of evidence because it was so unfairly prejudicial. And as we asserted earlier, it rises to the level of a constitutional problem. And, Your Honor, the process... So here is the question. I mean the limiting instruction. The questions posed by the interviewers are to be considered by you not as evidence of what occurred, but as statements designed to elicit a response from the defendants as to what occurred. That's what you think is appropriate? Yes, Your Honor. That is the limiting instruction that we asked the court for. How does the... After you lost on the admissibility in general, right? Yes, Your Honor. We argued for the court to keep the evidence out altogether but if it were going to allow it, to at least issue a limiting instruction and, of course, the court denied that. Your Honor, since prosecution has an obligation to present evidence in the least prejudicial manner available, here they had a manner much less prejudicial than putting the tape on. They could have just put the witness on the stand, the detective, and asked him questions as the court mentioned earlier. They chose not to do that and the court allowed the recordings to come in in derogation of Mr. Loza's constitutional rights and we've asked the court to vacate Mr. Loza's conviction. Thank you, counsel. Thank you. Mr. Genevievek, thank you too. We'll take this matter under advisement. Written disposition will be...